# EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MICHAEL R. BAHNMAIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-2099 JWL/DJW |
| | ) | |
| BANK OF AMERICA CORP., | ) | |
| KENNETH D. LEWIS, JOE L. | ) | |
| PRICE AND JONATHAN A. | ) | |
| THAIN, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR VIOLATIONS OF SECURITIES LAW

Plaintiff Michael R. Bahnmaier ("Plaintiff") alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bank of America Corp. ("Bank of America" or the "Company"), securities analysts' reports, and advisories about the Company, news articles, and information readily available on the internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### I. INTRODUCTION

1

### *"What idiots, what kind of idiots are running that bank?"*[1]

1.     This is a securities complaint against Bank of America and certain of its executive officers and arises from material misrepresentations and omissions in the Company's proxy statements and other public declarations, regarding, among other things, Bank of America's acquisitions of Countrywide Financial Corporation ("Countrywide") and Merrill Lynch & Co., Inc. ("Merrill Lynch") from January 11, 2008 through February 25, 2009 (the "Relevant Period"). This action asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC, which claims seek redress on the basis of negligence and do not sound in fraud. This action also asserts separate claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder by the SEC, as well as under Section 20(a) of the Exchange Act, which claims do sound in fraud.

2.     During the Relevant Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results. Defendants failed to expose the potential for litigation resulting from Countrywide's predatory lending practices that would eventually lead to an $8.7 billion settlement. Defendants hid the fact that Countrywide would put Bank of America's capital levels at risk by adding $30 billion in loan losses to the Company's balance sheet. Defendants also hid Bank of America's failure to

---

[1] Peter Cohan, <u>Bank of America heiress says 'idiots' are running the bank</u>, DailyFinance.com, February 26, 2009, quoting Virginia Hammerness, granddaughter of Bank of America founder, A.P. Giannini.

engage in proper due diligence in advance of its proposed merger with Merrill Lynch. Defendants further concealed Bank of America's failure to appropriately value or conduct due diligence on Merrill Lynch's mortgage-related assets, including its "toxic" holdings. Subsequently, losses reported by Merrill Lynch totaled $36.3 billion in 2007 and 2008, enough to wipe out eleven (11) years of earnings previously reported by the company. Because of Defendants' materially false and misleading statements, Bank of America's stock traded at artificially inflated prices throughout the Relevant Period, reaching $38.13 per share on October 1, 2008, and remaining in the $22-$25 per share range even as the stock market collapsed in early October 2008. During this time, Bank of America sold 455 million shares of its common stock to the public at $22 per share in a secondary common stock offering on October 10, 2008 (the "Offering"), which raised approximately $10 billion.

3.     As the real estate and credit markets continued to crumble in the first half of 2008, Bank of America announced a merger agreement with Countrywide that would make Bank of America the nation's largest mortgage lender and servicer.   Defendant Lewis praised the agreement as a "rare opportunity" and lauded Countrywide as the industry's "best domestic mortgage platform." Bank of America would acquire Countrywide in an all stock transaction worth approximately $4 billion.

4.     Defendants repeatedly assured Bank of America shareholders that the Company had taken appropriate steps to reduce its exposure to subprime mortgages. In June 2008, Bank of America's stock price began to decline as

3

investors remained concerned that Bank of America would be required to take major write-offs due to its subprime exposure, much of which came as a result of the merger with Countrywide.

5.     On June 25, 2008, Illinois Attorney General, Lisa Madigan, filed a lawsuit against Countrywide alleging the company had engaged in unfair and deceptive practices in an effort to induce homeowners to apply for risky mortgages beyond their means. California Attorney General, Jerry Brown, filed a similar lawsuit on the same date alleging Countrywide had broken the state's false advertising and unfair business practices laws.

6.     On July 2, 2008, Bank of America's deal to acquire Countrywide closed.

7.     On July 21, 2008, Bank of America announced better-than-expected second quarter 2008 results, beating analysts' estimates. Defendant Joe L. Price ("Price") in a conference call held to discuss these results stated, "We think the worst is behind us on value declines, as evidenced in our results for the quarter." Almost immediately, Bank of America's stock began to trade higher.

8.     On August 6, 2008, Connecticut Attorney General, Richard Blumenthal, filed suit against Countrywide seeking restitution for homeowners who were damaged by the company's deceptive lending practices. The suit also brought allegations that Countrywide had violated the state's consumer protection and banking laws.

4

9.     On September 12, 2008, with Lehman Brothers Holdings, Inc., on the verge of bankruptcy, investors became ever more concerned that Merrill Lynch would be the next company to run short of capital. As a result, Defendant John Thain ("Thain"), Chief Executive Officer of Merrill Lynch, contacted executives at Bank of America to propose a merger between the two companies. Over the course of the next couple of days, an agreement was put together calling for Bank of America to acquire Merrill Lynch in an all stock transaction valued at $50 billion (the "Acquisition").

10.     On September 15, 2008, Bank of America announced that it had entered into a Merger Agreement with Merrill Lynch. Investors questioned the hastiness of the deal and the transaction price, but Defendants confidently assured investors of the fairness of the price, including strong assurances to investors that Bank of America had conducted appropriate due diligence in determining the fairness and safety of the transaction. Defendants further represented that despite Merrill Lynch's noteworthy exposure to risky investments, the company had recently taken actions that substantially reduced its risk and the amount of toxic assets on its balance sheet.

11.     On October 6, 2008, Bank of America entered into a settlement agreement with the eleven state regulators who had brought suit against Countrywide. The settlement agreement required Bank of America to alter mortgages on approximately 400,000 homes in an effort to make the mortgages more affordable for homeowners. The Company agreed to drop mortgage rates

5

as low as 2.5 percent. When news of the settlement broke, Bank of America's stock price fell 37 percent, or $8.45, in one day.

12.   On October 7, 2008, Bank of America completed a secondary offering of $10 billion worth of common stock. Further, in October 2008, Bank of America received a $25 billion investment from the U.S. Government (with Merrill Lynch receiving $10 billion in funding). Bank of America confidently insisted that it "did not need and did not seek" the capital injection, especially in light of its recent stock offering.

13.   Relying on Defendants' misrepresentations, shareholders of Bank of America overwhelmingly approved the merger with Merrill Lynch on December 5, 2008, with 82% of the vote in support.

14.   By the time of the shareholder vote, but undisclosed to the public, Merrill Lynch had suffered monstrous losses for the fourth quarter of 2008. On December 17, 2008, Defendant Kenneth D. Lewis ("Lewis") met with government officials and advised the officials that Bank of America would be unable to complete the deal with Merrill Lynch without considerable assistance from the government. The government strongly encouraged Bank of America to continue with its acquisition of Merrill Lynch and agreed to provide additional funding and financial guarantees to protect against future potential losses. Although this additional government funding would substantially dilute the interests of Bank of America's common shareholders, they were not made privy to this information prior to the December 5, 2008 vote nor were they made aware of this prior to the merger's closing.

15.    The merger closed on January 1, 2009.  In press releases and filings following the close of the transaction, Bank of America emphasized the success and joint potential of the newly merged companies.

16.    On January 14, 2009, investors were stunned to learn that Bank of America would be the recipient of another multi-billion investment from the U.S. government due to significant losses suffered by Merrill Lynch in the fourth quarter of 2008.

17.    On January 16, 2009, Bank of America announced a $1.8 billion loss for the fourth quarter of 2008, citing deeper trading and loan losses. It was the Company's first reported loss in 17 years. The Company cut its dividend from $0.32 to a penny per share per quarter. In addition to its own losses, Bank of America reported that Merrill Lynch's preliminary results for the fourth quarter of 2008 indicated a net loss of $15.31 billion. This loss was separate from the $1.8 billion loss Bank of America had sustained in the quarter. Bank of America further confirmed that it would receive an additional $20 billion in assistance from the U.S. government and that the government had agreed to provide guarantees against further Merrill Lynch losses of $118 billion, with Bank of America covering the first $10 billion.

18.    Over the course of the next several days, details began to emerge concerning the truth behind Bank of America's deal with Merrill Lynch, including the fact that Bank of America had learned of Merrill Lynch's substantial fourth quarter losses prior to completing its acquisition of Merrill Lynch. Analysts

7

believed that Bank of America would need to raise another $80 billion to maintain adequate capital.

19.    As news of Bank of America's precarious financial position came to light, Bank of America's stock lost a dramatic 50% of its value. It declined from $10.20 per share on January 14, 2009 to close at $5.10 per share on January 20, 2009.

20.    On January 22, 2009, Defendant Thain, former CEO of Merrill Lynch, was relieved of his duties at Bank of America. This action was taken after another financial scandal was disclosed at Merrill Lynch, including lavish spending of shareholder money by Defendant Thain.

21.    On January 27, 2009, New York State Attorney General Andrew Cuomo ("Cuomo") announced that a subpoena had been issued to Defendant Thain in connection with an investigation into $4 billion in end of the year bonuses paid by Merrill Lynch to its executives.

22.    On February 20, 2009, Cuomo announced that a subpoena had been issued to Defendant Lewis in connection to allegations that Bank of America had withheld pertinent information from shareholders.

23.    On February 23, 2009, it was reported by *CNNMoney.com* that a New York state judge had ordered Defendant Thain to provide further testimony about billions of dollars in bonuses handed out by Merrill Lynch on the eve of the investment bank's merger with Bank of America. In a document filed with the New York state court that same day, Cuomo said Thain refused to answer questions about the "determination and amount of individual bonuses awards for

all, but five employees at Merrill Lynch." According to the documents filed by Cuomo, Thain refused to answer the questions because he was instructed not to by Bank of America.

24.    On February 25, 2008, it was revealed that Merrill Lynch's fourth-quarter losses were $500 million more than Bank of America had previously estimated, bringing the total fourth-quarter loss to $15.84 billion.

25.    The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

    a. The Company was failing to sufficiently reserve for mortgage-related exposure, causing its balance sheet and financial results to be overstated;

    b. The Company failed to engage in proper due diligence in assessing the fairness of the deals with Countrywide and Merrill Lynch;

    c. The Company's acquisitions of Countrywide and Merrill Lynch would have catastrophic consequences on the Company's capital position and overall operations;

    d. The acquisition of Countrywide would saddle Bank of America with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to $8.7 billion in losses related to litigation for predatory lending;

    e. Merrill Lynch had not substantially decreased its risk exposure to troubled mortgage-related assets;

    f. The significant and continuing deterioration of Merrill Lynch's financial position, including its substantial fourth quarter 2008 loss, was sufficient to trigger termination of the merger;

    g. That the Company either knew it did not have a firm grasp on the aggregate amount of Merrill Lynch's losses and deteriorating positions or knew such information and withheld it from the public;

9

h. The Company had to approach the U.S. government for additional funding and financial guarantees in December 2008 in order to complete its acquisition of Merrill Lynch; and

i. The Company's capital base was not adequate to withstand the significant deterioration in the subprime market and, as a result, Bank of America would be forced to seek government funding in order to raise significant amounts of additional capital.

26.    As a result of Defendants' false and misleading statements, Bank of America's stock traded at artificially inflated levels during the Relevant Period. However, after the above revelations seeped into the market, the Company's share price was hammered by massive sales, sending it down more than 86% from its price before these disclosures.

## II. JURISDICTION AND VENUE

27.    This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

28.    Venue is proper in this District pursuant to §27 of the Exchange Act. Acts and transactions by the Defendants giving rise to the violations of law complained of herein occurred in this District.

## III. PARTIES

### A. Plaintiff

29.    Plaintiff Bahnmaier purchased 70,000 shares of Bank of America common stock at a total cost of $2,140,000.00. Plaintiff made purchases of 50,000 shares at a price of $37.00 per share on April 11, 2008, and 20,000 shares at a price of $14.50 per share on November 19, 2008. Plaintiff was an

10

owner of Bank of America common stock at times relevant to the claims in this Complaint.

**B. Defendants**

30.     Defendant Bank of America, a Delaware corporation, is a financial holding company, providing a range of banking and non-banking financial services and products in the United States and internationally.

31.     Defendant Lewis is and was at all relevant times, the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Bank of America. Lewis solicited approval of the Acquisition through his recommendation as a member of the Company's board of directors (the "Board") appearing in the Proxy Statement for shareholders to vote in favor of the Acquisition. Lewis also personally signed a cover letter in the Proxy Statement soliciting shareholder approval of the Acquisition.

32.     Defendant Price is Chief Financial Officer ("CFO") of Bank of America.  Price participated in the issuance of improper statements and the preparation of improper press releases and SEC filings.

33.     Defendant Thain was, at the times relevant to this action, the CEO of Merrill Lynch and, in that capacity, he personally signed the Proxy Statement soliciting the votes of Bank of America shareholders in favor of the Acquisition. Thain assumed a senior executive position managing Merrill Lynch's operations following the Acquisition.  He remained in this position until his resignation on January 22, 2009.

11

34.    The Defendants referenced in ¶¶30–32 are collectively referred to in the Complaint as the "Individual Defendants."

## IV. SUBSTANTIVE ALLEGATIONS UNDER SECTION 14(a) AND RULE 14a-9

### A. The Acquisition of Merrill Lynch

35.    Bank of America is one of the world's largest financial institutions. It operates as a bank and financial holding company under U.S. law.    The Company provides a full range of banking, investing, asset management and other financial and risk-management products and services to individual consumers, small and middle market businesses and large corporations.

36.    Bank of America's operational strength and profitability came primarily from providing unmatched convenience in the United States, serving more than 59 million consumer and small business relationships with more than 6,000 retail banking offices, more than 18,000 ATMs and award winning online banking with nearly 24 million active users.

37.    These advantages were magnified by increasing defaults on sub-prime mortgage loans and related mortgage-backed securities issued and/or held by other banks.  Bank of America claimed to have judiciously avoided significant exposure to such toxic assets leaving it in an extremely strong competitive position within the financial services industry.  Bank of America presented itself as having an impregnable balance sheet that would enable the Company to weather the crisis running roughshod over the financial world.

38.    The financial crisis provided the opportunity for Bank of America to acquire Merrill Lynch.  On September 13, 2008, Defendant Thain initiated the

12

whirl-wind transaction when he called Defendant Lewis to explore the possibility of a merger. Defendants Lewis and Thain continued this discussion over the course of the next two days and on September 15, 2008, an agreement was entered into for Bank of America to acquire Merrill Lynch.

39.   On September 15, 2008, a press release was issued by Bank of America (attached to a Form 8-K filed with the SEC that same day) announcing its proposed acquisition of Merrill Lynch. The press release stated in relevant part:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a company unrivalled in its breadth of financial services and global reach.
>
> **"Acquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders," Bank of America Chairman and Chief Executive Officer Ken Lewis said. "Together, our companies are more valuable because of the synergies in our businesses."**
>
> "Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis and our senior management teams to create what will be the leading financial institution in the world with the combination of these two firms," said John Thain, chairman and CEO of Merrill Lynch.
>
> Under terms of the transaction, Bank of America would exchange .8595 shares of Bank of America common stock for each Merrill Lynch common share. The price is 1.8 times stated tangible book value.
>
> Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. The acquisition is expected to be accretive to earnings by 2010.
>
> The transaction is expected to close in the first quarter of 2009. It has been approved by directors of both companies and is subject to

13

shareholder votes at both companies and standard regulatory approvals.

\* \* \*

***Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States.*** Merrill Lynch adds strengths in global debt underwriting, global equities and global merger and acquisition advice.

After the acquisition, Bank of America would be the number one underwriter of global high yield debt, the third largest underwriter of global equity and the ninth largest adviser on global mergers and acquisitions based on pro forma first half of 2008 results.

(Emphasis added).

40.     The acquisition of Merrill Lynch was a noteworthy reversal for Defendant Lewis, who had previously stated his distaste for the investment banking industry.  When Bank of America's own investment banking division cut the Company's third-quarter 2007 profits by almost a third, he claimed he was no longer interested in growing it.  In a conference call with analysts following the losses he stated, "I've had all the fun I can stand in investment banking at the moment."  However, following the Acquisition announcement he was quoted as saying the purchase of Merrill Lynch was the ***"strategic opportunity of a lifetime."*** (Emphasis added).

41.     A conference call was held regarding the Acquisition later that day. Defendant Lewis made it his goal to reassure the investing public that the Company had done appropriate due diligence to understand the risks and the quality of assets it would be taking on through the Acquisition.  Lewis endorsed the comments of Defendant Price, Bank of America's CFO, that Bank of America

14

was well aware of Merrill Lynch's credit and assets because of its presence as a competitor in the marketplace and even though the due diligence period had been short, it had been thorough and sufficient.  Defendant Price specifically stated:

> Clearly we've had a tremendous amount of historical knowledge both as a competitor with Merrill Lynch but also have reviewed and analyzed the company over the years. As Ken referenced, we did have several advisors, among them J.C. Flowers with pretty extensive knowledge of the company.
>
> While none of us like the market turmoil we've been through in the last year, it has caused us all to be much more attuned to the quality of particular name credits and/or other asset classes. So it's not as if we don't have a very significant knowledge of the markets around the asset classes that are most problematic. In addition, as you would expect we deployed the team that we would ordinarily deploy in these types of situations which had well over 45 people from our team on site as well as others off site, outside counsel and the like. *So collectively with that group and quite frankly the progress that Merrill Lynch had made in reducing the risk exposures and analyzing them and having all that laid out given the efforts that the management team has made over the last period made it possible for us.*

(Emphasis added).

42.   Defendant Lewis added to Price's analysis:

> Just to touch on a few other things of importance in the transaction before taking questions, from a risk or due diligence perspective as you heard Ken say we competed against Merrill Lynch and have known them well for years in addition to discussing business opportunities several times. *We sent in a large team to review areas such as asset valuations, trading positions and the like. We also were joined by a team from J.C. Flowers that had done extensive due diligence over some time in reviewing other potential transactions, so they were very familiar with Merrill Lynch's books.*

(Emphasis added).

15

43.     Defendant Lewis went on to brag to investors that Bank of America did not need government funds.  He stated, *"I've had a lot of conversations with Secretary Paulson over the last week or so about the Lehman issue and ideas that we had, but I will leave those to just to be in private.  But we have asked for no relief, no capital relief on this deal."* (Emphasis added).

44.     While Lewis appeared supremely confident in the Acquisition, advisors attempted to warn him about the deal which was then valued at $50 billion.  Merrill Lynch's market value at the time was only $27 billion.  By the time the deal closed, Merrill Lynch's market price had dropped below $20 billion.  According to a January 28, 2009 *Businessweek* article, Defendant Lewis's unwillingness to listen to the warnings of others and his dictatorial management style earned him the nickname "King Jong III" with Company employees on the trading floor.

45.     The truth is that Bank of America's due diligence was shoddy at best and government funds were, in fact, needed.  The Company's rank and file were filled with trepidation at the Acquisition, especially in light of the fact that Merrill Lynch competitor Lehman Brothers was collapsing over the same weekend the Acquisition agreement was forged.  According to *Businessweek*, one Bank of America derivatives expert told of being called to a law office at 2:00 in the morning following a fourteen-hour work day.  He was asked to check Merrill Lynch's books and come to a decision within 24 hours.  Another Bank of America employee who works closely with management was quoted as saying,

16

*"It would take much more time than we were given to value [Merrill's illiquid] assets."* (Emphasis added).

46.     Bank of America filed a Form 8-K with the SEC on September 18, 2008. The filing described the terms of the Acquisition and attached as Exhibit 2.1 an Agreement and Plan of Merger, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. and Bank of America Corporation (the "Agreement"). Defendants Lewis and Thain had signed the Agreement on behalf of Bank of America and Merrill Lynch respectively. The merger was the capstone on a string of acquisitions by Bank of America in which the Company, at Defendant Lewis's behest, had also added subprime lender Countrywide Financial and LaSalle Bank, along with their toxic balance sheets, at a cost of $75.2 billion.

**B. Defendants Issue A Proxy Statement Containing Material Misstatements and Omissions**

47.     On October 31, 2008, Defendants issued a Proxy Statement in an effort to obtain shareholder approval of the Acquisition. The Proxy Statement urged all of Bank of America's shareholders to vote in favor of the Acquisition and recommended the Acquisition as being fair and in the best interests of Bank of America shareholders. The Proxy Statement specifically stated:

> The Bank of America board of directors believes that the merger is in the best interests of Bank of America and its stockholders and has unanimously approved the merger and the merger agreement. The Bank of America board of directors unanimously recommends that Bank of America stockholders vote "FOR" the proposal to issue shares of Bank of America common stock in the merger.

17

48.    The Proxy Statement also included detailed reported results with respect to Merrill Lynch's operations for the fiscal quarter ended June 30, 2008 and under a heading titled "Recent Developments" also discussed Merrill Lynch's more recent financial results.

49.    The Proxy Statement contained material misstatements and omissions because it did not disclose material facts to Bank of America shareholders necessary for them to cast fully informed votes with respect to the Acquisition. The Proxy Statement significantly overvalued Merrill Lynch's assets and otherwise did not accurately disclose Merrill Lynch's financial condition to Bank of America shareholders. The Proxy Statement did not inform Bank of America shareholders of the significant risks and liabilities that Bank of America and its shareholders would be acquiring in the event the Acquisition closed. Further, the Proxy Statement did not reveal that Bank of America and its advisors had conducted inadequate due diligence on Merrill Lynch and that the recommendation in the Proxy Statement in favor of the vote and the other positive statements concerning the vote were made without an adequate basis.

50.    On November 6, 2008, Merrill Lynch reported financial results for the fiscal quarter ended September 30, 2008. Those results included substantial mark downs in Merrill Lynch's assets and resulted in a reported net loss of over $5 billion.

51.    On November 26, 2008, the Federal Reserve Board approved the proposed Acquisition.

18

52.    On December 5, 2008, Bank of America held a special meeting of shareholders to vote on the Acquisition.  In advance of this vote, Defendants failed in their duty to update and correct the material misstatements and omissions in the Proxy Statement.  Not only did Defendants not correct these material misstatements and omissions, but Defendants did not update investors concerning the continued deterioration of Merrill Lynch's financial condition after the Proxy Statement was issued but before investors actually cast their votes on December 5, 2008.  During that period, Merrill Lynch had suffered additional losses in their investments and securities, amounting to billions of dollars in further losses and a significant increase in the risk that Bank of America would take on if the Acquisition were consummated.  In addition, Defendant Thain paid out a reported $4 billion in bonuses to Merrill Lynch executives between the time of the Acquisition agreement and the shareholder vote.  These bonuses were known to Bank of America and Defendant Lewis, but they failed to disclose this information to shareholders before the vote. This information, which was highly material to Bank of America shareholders and their decision concerning the vote on the Acquisition, was never provided to shareholders prior to the December 5, 2008 vote.

53.    As Heidi Moore of *The Wall Street Journal* stated in a 2009 report, **"Lewis's optimistic statements on the deal throughout left investors ill-prepared to expect potential losses so severe that the U.S. Treasury would have to step in with additional funds."**  (Emphasis added.) She went on to call

19

Bank of America's course of conduct **"an object lesson in 'How Not To Communicate With Shareholders.'"** (Emphasis added).

54.     Lacking the material facts necessary to fully appreciate the impact of the Acquisition, at the December 5, 2008 special meeting, 82% of Bank of America shareholders who voted approved the Acquisition and the related issuance of additional shares by the Company necessary to consummate the Acquisition. Bank of America promptly issued a press release announcing that its shareholders had approved the Acquisition.

**C. The Truth Begins to Come Out**

55.     On December 6, 2008, the day following the shareholder vote, Citigroup analysts warned investors to look for, "mark to market losses on high risk assets – Combined [Bank of America] and [Merrill Lynch] held $56 billion of 'high-risk' assets as of 9/30/08. Given swift declines in the equity and structured product markets, we estimate BAC will see over $1.5 billion in marks during 4Q, assuming market conditions don't improve, while MER positions could see $3.6 billion in losses."

56.     By January 1, 2009, analysts were openly skeptical about the Acquisition. Sanford C. Bernstein analyst Brad Hintz opined that:

> From BAC's point of view Merrill Lynch may look less attractive as Mr. Lewis's management team realizes that they have purchased a massive portfolio of troubled asset classes (residential and commercial mortgages, RMBS, CMBS, leveraged loans and CDOs) and significant CDO underwriter's liability claims. Certainly there is concern that Merrill's troubled assets and counterparty exposure could continue to drive new writedowns for Bank of America after the MER acquisition closes and that unhappy purchasers of MER's 2005-2006 CDOs will likely bring substantial claims against BAC under sections 11 and 12(2) of the Securities Act of 1933.

57.     On January 14, 2009, Sandler O'Neill analyst Jeff Harte stated that the Merrill Lynch acquisition "significantly increases [Bank of America's] exposure to currently depressed capital markets related revenues." He went on to cut his estimates for Bank of America's earnings accordingly.

58.     Also on January 14, 2009, following the stock market's close, *The Wall Street Journal* reported that Bank of America was near an agreement with U.S. officials that would provide it with billions of dollars in financial assistance from the federal government, likely to include an infusion of fresh capital and the backstopping of billions of dollars of Bank of America's assets, according to the report. The news came after Bank of America's shares gyrated wildly during the day, as investors reacted to earlier reports that the firm would need more government funds to stay afloat.

59.     On January 15, 2009, multiple news services carried the story of an impending government bailout of Bank of America relating to its purchase of Merrill Lynch. In reaction to these reports, Bank of America announced that it would move up its reporting of quarterly earnings.

**D. The Truth is Finally Revealed**

60.     On January 16, 2009, Bank of America issued a press release reporting that for the fiscal quarter ended December 31, 2008, the Company had a net loss of $1.79 billion and diluted loss per common share of $0.48, with $15.31 billion in losses attributable to the reported results of Merrill Lynch for the quarter. Merrill Lynch's losses were reportedly "driven by severe capital markets dislocations." As a result of these reported losses, Bank of America disclosed

21

that it would be cutting its quarterly dividend to a nominal amount of one penny

per share. The press release also stated that:

> In view of the continuing severe conditions in the markets and economy, the U.S. government agreed to assist in the Merrill acquisition by making a further investment in Bank of America of $20 billion in preferred stock carrying an 8 percent dividend rate.
>
> In addition, the government has agreed to provide protection against further losses on $118 billion in selected capital markets exposure, primarily from the former Merrill Lynch portfolio.
>
> Under the agreement, Bank of America would cover the first $10 billion in losses and the government would cover 90 percent of any subsequent losses. Bank of America would pay a premium of 3.4 percent of those assets for this program.

61. Significant negative fourth-quarter items for Merrill Lynch were

reported in the January 16 press release, including:

> a. Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion;
>
> b. Goodwill impairments of $2.31 billion;
>
> c. Leveraged loan write downs of $1.92 billion;
>
> d. $1.16 billion in the U.S. Bank Investment Securities Portfolio write downs; and
>
> e. Commercial real estate writedowns of $1.13 billion.

62. On January 16, 2008, *The Wall Street Journal* carried a story with a

headline of "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991

Level." The article states, among other things that:

> The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement. Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.

63.     The January 16, 2009 *Wall Street Journal* article also quoted Bradley Dorman, managing partner of Whiterock Point Partners, L.P., an investment advisor with 315,000 shares of Bank of America common stock stating that: ***"Bank of America didn't do proper due diligence."*** (Emphasis added).

64.     Also on January 16, 2009, Evan Newmark of *The Wall Street Journal* provided his analysis of the Acquisition.   In his article he noted that Defendant Lewis had purchased "Merrill Lynch, a business that may have been worth nothing."  He went on to state that Merrill Lynch had "snookered" Lewis and noted that even at the time, the price Bank of America paid for Merrill Lynch was "baffling."  The article continued:

> Before the Merrill deal, a share of Bank of America traded at about $34. Today, a share trades at a little more than $7, that is a decline of almost 80%.
>
> Of course, the Merrill deal alone isn't to blame for the mess at Bank of America. All of the world's banks are suffering. And CEOs overpay for acquisitions all the time.
>
> **But the Merrill deal is an outlier--an awful deal at inception that just keeps on getting worse.**
>
> The optics of Merrill executives, Tom Montag and Peter Kraus pocketing tens of millions of dollars in payouts were bad. That little tussle over Thain's bonus was unseemly. But nothing is as bad as Merrill posting a staggering $15 billion loss in the fourth quarter.
>
> **To uncover that two-thirds of these losses arose after the Dec. 5 shareholder vote is not only inexplicable, it is inexcusable.** By November and December, everyone on Wall Street assumed the worst. Except, apparently, Ken Lewis and his team at Bank of America.

> *BofA claims it conducted an excruciating level of due diligence on Merrill Lynch. But given Lewis's surprise over Merrill's losses in December how can that be?*

(Emphasis added).

65.    On January 17, 2009, *The Wall Street Journal* carried a story with the headline of "Bank of America Goes on Offensive: Stock Tanks on Quarterly Loss; Details of Bailout; Employees Angry." The story quoted Paul Miller, a securities analyst with the Friedman Billings Ramsey Group Inc., as stating that Defendant Lewis "has very little credibility with the investor public right now."

66.    On January 20, 2009, based on the new information revealed in the previous days by Bank of America, analysts opined that Bank of America would need to raise an additional $80 billion to restore its capital to adequate levels.

67.    On January 22, 2009, Defendant Thain was relieved of his duties at Bank of America, in part, reportedly, because Defendant Lewis blamed him for not disclosing Merrill Lynch's true financial condition. Thain issued a memo upon his departure which was reported in *The Wall Street Journal* on January 26, 2009. The memo provided in part:

> It has been an honor to lead this company over the last very difficult year.
>
> The decisions that I made were always with the best interests of our shareholders and employees above all. I believe that the decision to sell to Bank of America was the right one for our company and our clients. While the execution has been difficult, I still believe in the strategic rationale of the transaction and I wish you all the best for the future of the combined companies.
>
> I want to address several topics that have been inaccurately reported in the press.

\* \* \*

24

The second topic is the losses in the fourth quarter, which were very large and unfortunate. However, they were incurred almost entirely on legacy positions and were due to market movements. We were completely transparent with Bank of America. They learned about these losses when we did. The acting CFO of my businesses was Bank of America's former Chief Accounting Officer. They had daily access to our p&l [Deal Journal translator: that means "profit and loss," or the statement of the bank's accounts], our positions and our marks.

Our year end balance sheet target (which we more than met) was given to us by Bank of America's CFO.

68.    On January 27, 2009, New York State Attorney General Cuomo announced that a subpoena had been issued to Defendant Thain in connection with an investigation into billions of dollars in end of the year bonuses paid by Merrill Lynch to its executives.  The *New York Times* revealed on February 8, 2009 that Bank of America knew about the bonuses, but this information was not revealed to shareholders until the New York attorney general made his announcement.

69.    On February 20, 2009, New York State Attorney General Cuomo announced that a subpoena had been issued to Defendant Lewis as part of an investigation into whether or not Bank of America had withheld information from investors in violation of New York State Law.  The investigation centers on whether investors were misled about the depth of Merrill's losses and whether bonuses paid to Merrill Lynch employees before the deal closed violated New York law.

70.    On February 23, 2009, a New York state judge ordered Defendant Thain to provide further testimony on the bonuses paid by Merrill Lynch to its

25

executives.   According to documents filed by Cuomo, Thain had refused to answer questions about bonuses paid to all but five Merrill Lynch executives. The documents went on to state that Thain had refused to testify because he was instructed not to by Bank of America. The five executives Thain did testify about had all foregone their bonuses and were irrelevant to Cuomo's investigation.

71.    On February 25, 2009, *The Wall Street Journal* reported that Merrill Lynch's losses were even greater than the $15.31 billion that had been reported on January 16, 2009.  Fourth-quarter losses had actually totaled $15.84 billion, more than $500 million higher than the prior estimate.

72.    Investors were shocked by these developments and quickly pushed down the price of Bank of America common stock in active trading from its closing price of $10.20 per share on January 14, 2009 to close at $5.61 per share on February 25, 2009, a decline of 45%.

### V. CLAIMS UNDER SECTION 14(a) AND RULE 14a-9: CLAIMS FOR RELIEF

73.    The claims set forth herein pursuant to Section 14(a) and Rule 14a-9 are not based on any allegations of knowing or reckless misconduct by any Defendant.  These claims do not allege, and do not sound in fraud, but rather in negligence, and Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under Section 14(a) and Rule 14a-9.

**First Claim for Relief for Violation of Section 14(a)
of the Exchange Act and SEC Rule 14a-9**

26

74.     Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

75.     This claim for relief is brought against Defendants Bank of America, Lewis, Price and Thain (collectively, the "Proxy Defendants").

76.     This claim for relief is brought by Plaintiff against the Proxy Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC, which prohibits making material misstatements and omissions in a proxy statement.

77.     The misstatements and omissions alleged above were material. The Proxy Defendants made, or were responsible for making, the misstatements and omissions.   Through their negligence in issuing the Proxy Statement containing material misstatements and omissions, the Proxy Defendants failed to disclose to Bank of America shareholders all material facts necessary for Bank of America shareholders to cast a fully informed vote with respect to the Acquisition, as alleged above.

78.     Plaintiff and other shareholders have been injured by the material misstatements and omissions contained in the Proxy Statement.

79.     Plaintiff is entitled to recover damages to compensate him for all damages resulting from the acts and omissions of the Proxy Defendants in violation of Section 14(a) of the Exchange Act.

80.     Less than two years have elapsed from the time plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time this Complaint was filed.

27

## VI. SUBSTANTIVE ALLEGATIONS UNDER SECTION 10(b)
## AND SEC RULE 10b-5

81.     The claims herein under Section 10(b) and Rule 10b-5 incorporate
by reference the allegations set forth above.

### A. The Acquisition of Countrywide

82.     On January 11, 2008, Bank of America and Countrywide
announced they had entered into a merger agreement whereby Bank of America
would acquire Countrywide in an all stock transaction valued at $4.1 billion.  In a
press release announcing the merger, which was also filed in a Form 425
prospectus with the SEC, Defendant Lewis praised the addition of Countrywide
to the Bank of America family:

> Countrywide presents a rare opportunity for Bank of America to add
> what we believe is **the best domestic mortgage platform at an
> attractive price and to affirm our position as the nation's
> premier lender to consumers**.

* * *

> We are aware of the issues within the housing and mortgage
> industries.  The transaction reflects those challenges. Mortgages
> will continue to be an important relationship product, and **we now
> will have an opportunity to better serve our customers and to
> enhance future profitability**.

(Emphasis Added).

83.     The press release went on to tout Countrywide's subprime
initiatives, stating in relevant part:

> Both Bank of America and Countrywide continue to work with public
> officials and community groups to explore new initiatives to help
> homebuyers and communities affected by the subprime issue.

- *Bank of America and Countrywide both support efforts to fight predatory lending practices.*

- Bank of America and Countrywide are active participants in the Hope Now Alliance, which has launched a letter campaign to delinquent borrowers, created a counseling hotline and facilitates the sharing of bestservicing practices. Bank of America also will continue Countrywide's commitment to participate in the American Securitization Forum's December 2007 reset freeze framework for 2/28 and 3/27 adjustable rate mortgages (ARMs).

- Bank of America will continue Countrywide's commitment to participate in California Governor Arnold Schwarzenegger's November 2007 subprime ARM program.

Bank of America plans to expand the capacity and marketing of credit counseling programs and internal capacity and flexibility for loan modifications for loan workout teams following the purchase of Countrywide.

Countrywide also has a number of programs in place designed to minimize foreclosures where feasible.

- On October 23, 2007, Countrywide announced a major expansion of its foreclosure prevention efforts by starting a $16 billion home preservation program to assist as many as 82,000 subprime hybrid [adjustable rate mortgage] customers facing [adjustable rate mortgage] resets through the end of 2008.

- On October 24, 2007, Countrywide entered into a groundbreaking partnership with the Neighborhood Assistance Corporation of America (NACA) to leverage Countrywide's market leading home retention programs and NACA's unique model for counseling borrowers.

- On December 21, 2007, Countrywide announced work on an agreement with the Association of Community Organizations for Reform Now (ACORN) to serve as a blueprint for home retention and foreclosure prevention initiatives in the mortgage

29

industry, with a particular focus on subprime borrowers.

(Emphasis Added).

84. The statements above were false and/or misleading because Countrywide was under investigation in several states, including Arizona, Connecticut, Florida, Iowa, Michigan, North Carolina, Ohio, Texas and Washington for predatory lending practices. Further, the Defendants did not reveal to investors that the merger would saddle Bank of America with $30 billion in loan losses and seriously threaten the adequacy of the Company's capitalization. This material information was knowingly or recklessly disregarded by Defendants and the failure to disclose this information constituted a violation of Section 10(b) and Rule 10b-5.

85. The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

    a. The Company's acquisition of Countrywide would have catastrophic consequences on the Company's capital position and overall operations;

    b. The acquisition of Countrywide would saddle Bank of America with $30 billion in loan losses and put the Company's capital levels at risk while exposing the Company to billions in losses related to Countrywide's predatory lending practices;

    c. The Company's capital base was not adequate to withstand the toxic assets and legal issues brought to the merger by Countrywide.

86. On April 11, 2008, Plaintiff purchased on the open market 50,000 Bank of America shares at $37.00 per share.

87.     On April 29, 2008, Countrywide reported a shocking first quarter loss of $893 million, reflecting $3 billion in credit-related charges.   Countrywide wrote off $1.5 billion in losses on its residential loan portfolio alone, ten times the amount written off the previous year.   The news led to Standard & Poor's decision to downgrade Countrywide debt to junk-bond status.   Countrywide shares dropped a precipitous 10 percent in one day.

88.     Over the next week, it became apparent that the merger was going forward despite the fact that Countrywide was clearly a dying company.   Further, instead of buying Countrywide at a discount as the merger agreement anticipated, Bank of America would be paying a 20 percent premium.   An analyst for Friedman Billings Ramsey suggested that a fair price would be $2.00 per share as opposed to the $7.00 per share price that Bank of America was preparing to pay.   The analyst went on to write that, "Many investors believe that Bank of America does not want the negative publicity from renegotiation to ruin a solid reputation. *This thesis ignores the marks that Bank of America will have to take if it closes the deal as is, and it could put Bank of America's well-capitalized levels at risk.*" (Emphasis Added.)   As the realization of what Bank of America was acquiring crept into the market, share prices began to descend, dropping 11 percent between May 1 and May 7, 2008.

89.     On January 18, 2008, Bank of America held a teleconference to discuss its acquisition of Countrywide.   Defendant Lewis spoke to analysts and investors:

> We have asked you to join us today to talk about the acquisition of Countrywide.

31

* * *

Today's announcement presents a unique opportunity to acquire the mortgage capabilities and scale that are critical to our customer relationships at a time when valuations are, in fact, very compelling. Our extensive due diligence supports our overall valuation and pricing of the transaction.

* * *

We now move to the top of both originating and servicing, with a 25% share of the origination market and a 17% share of the servicing market. While we are regarded as one of the most efficient mortgage shops, Countrywide has product expertise and a sales culture that tops our capabilities. By utilizing their skill sets, we can offer more mortgage capabilities to our vast customer base.

* * *

When we marry the best practices of sales capabilities and efficient operations, we can dramatically improve the profitability of the Company.

* * *

So we view this as a one time opportunity to acquire the best mortgage platform in the business at a time when the value is very attractive.

* * *

Let me tell you just a few things that make Countrywide an important product. As I said, they are America's largest overall originator of mortgages, with leadership positions across all sales channels and retail, wholesale, and correspondent lending. With a $1.5 trillion dollar servicing portfolio, they service more than 9 million loans.

They have locations – either loan offices, 700-plus or banking centers, 200-plus – in nearly every state in the U.S. These offices are focused on the most heavily-populated United States of California, Florida, and Texas, to name a few, and staffed with 15,000 mortgage sales associates.

These associates are led by a long-tenured management team that has built an incredible company with areas of operational expertise

that has weathered many past cycles. Their balance sheet has more than $200 billion in assets and roughly $55 billion in deposits.

As you are all aware, this year has been tough for them, as their model was severely impacted by market liquidity concerns and the ability to fund asset growth. These problems play into our strengths as we have the funding with our deposit book and access to the markets to continue to grow the business.

\* \* \*

We expect to close the deal in the third quarter after customary approvals from regulatory bodies as well as Countrywide shareholders. We have completed due diligence and received both board's approvals.

Now as Ken said, the due diligence on this deal was extensive. We had more than sixty people on the ground for the better part of the last thirty days, with more focus picking up through the holidays. The focus of the due diligence, as you would expect was on the mortgage servicing rights, credit, and legal, as well as accounting and operational areas. The results of our due diligence support our overall valuation and pricing of the transaction.

90.    Defendant Price also spoke at the conference and took questions

from analysts:

**RONALD TEMPLE:** Okay, that helps. Two other quick ones. Do you have any protection from legal ramifications? Obviously, Countrywide has been involved in some litigation thus far, how should we think about that? I think Ron Mandle kind of referenced that implicitly as well.

**JOE PRICE:** Go back to the comment made earlier. Again, our being clearly focused on those areas in due diligence both from a kind of corporate as well as particular product aspect, and incorporated that in the economic evaluation in arriving at our pricing or validating our pricing.

\* \* \*

**LORI APPELBAUM, ANALYST, HOLDMAN SACHS:** My questions were largely asked by Ron and Ron, but I will try again

anyway. Joe, you mentioned that much of the due diligence was spent on the MSR credit and legal; and that was a factor in how you set the exchange ratio. If you could provide any key assumptions across those three measures at all in coming to the exchange ratio.

**JOE PRICE:** No, not really. Let me clarify, Lori. What we did is we did our due diligence; and obviously our exchange ratio was established based on market pricing and all the other attributes that you would consider in that.

What I was meaning is that our due diligence findings were supported or fully encompassed in when we set that exchange ratio, so.

But no, I am not prepared to provide any details specific as to specific estimates on particular items. Obviously, that will change up through the date of application of purchase accounting once the deal is approved in early third quarter period.

91.    Defendant Lewis also spoke to analysts at the conference:

**JEFF HARTE, ANALYST, SANDLER O'NEILL:** Good morning, guys. Most of my questions have been hit. I have two left. One, I understand the due diligence process from the credits and what is in the portfolio standpoint. Can you talk a little bit more about how you got comfort on the litigation and potential regulatory site? Because we are looking at one of the biggest subprime issuers out that. With subprime having a lot of problems, and government kind of entities looking into it, and lawsuits potentially looming, how do you get comfortable with your potential exposures on those two fronts?

**KEN LEWIS:** Well, all I can say is we had a lot of advice from both our internal group and also from two other entities that put some parameters around it.

92.    Despite these repeated specific questions on potential legal issues facing Countrywide, Defendants Price and Lewis refused to inform investors about the state investigations surrounding Countrywide's predatory lending practices.

34

93.    On June 25, 2008, Illinois State Attorney General, Lisa Madigan, and California State Attorney General Jerry Brown, filed lawsuits against Countrywide in Illinois and California respectively.  The suits sought to recover damages from Countrywide for unfair and deceptive practices, violation of false advertising laws, and unfair business practices.

94.    Bank of America completed the purchase of Countrywide on July 1, 2008. Defendant Lewis was quoted in a press release as stating:

> Mortgages are one of the three main cornerstone consumer financial products along with deposits and credit cards.  This purchase significantly increases Bank of America's market share in consumer real estate, and as our companies combine, we believe Bank of America will benefit from excellent systems and a broad distribution network that will offer more ways to meet our customers' credit needs.

95.    On August 6, 2008, Connecticut State Attorney General, Richard Blumenthal ("Blumenthal"), filed suit against Countrywide seeking to recover damages for violations of state consumer protection and banking laws. Blumenthal stated in relevant part:

> ***Countrywide conned customers into loans that were clearly unaffordable and unsustainable, turning the American Dream of homeownership into a nightmare.*** When consumers defaulted, the company bullied them into workouts doomed to fail. Countrywide crammed unconscionable legal fees into renegotiated loans, digging consumers deeper into debt. ***The company broke promises that homeowners could refinance, condemning them to hopelessly unaffordable loans.***

> Countrywide was at their side – as an insolvency enabler. Countrywide inflated homeowner incomes to qualify them for loans they couldn't pay back and misled consumers about loan terms.

> Countrywide stacked the deck and the deal against its customers: Our goal is to un-stack the deck – and undo the deals – restoring fairness and fiscal sense to mortgages. I will fight for restitution –

35

money back to homeowners used and abused by Countrywide -- as well as fines and forfeitures to the state. Our lawsuit seeks to invalidate loans that violate state law, allowing consumers to shed illegal, unreasonable fees and conditions that leave them at the precipice of foreclosure. We must vigorously fight predatory lending practices that trap consumers on a debt treadmill.

(Emphasis Added.)

96.    In all, eleven states filed suit against Countrywide over predatory lending practices including Arizona, California, Connecticut, Florida, Illinois, Iowa, Michigan, North Carolina, Ohio, Texas and Washington.

97.    Bank of America sought a solution to Countrywide's legal issues, and on October 6, 2008, the Company entered into and announced a historic settlement agreement.  The settlement required Bank of America to restructure approximately 400,000 residential mortgages, dropping interest rates to as low as 2.5 percent.  News of the settlement hit the market like a tidal wave.  Bank of America shares were pounded based on the Company's disappointing news, falling 27 percent or $8.45 by the close of trading on October 7. For California alone, the settlement was valued at $3.5 billion while Illinois home owners received $190 million in relief.  Bank of America agreed to waive $79 million in late fees and $56 million in prepayment penalties.  Bank of America spokesman, James M. Mahoney, admitted that the Company had prepared for such a loss when they acquired Countrywide, but investors were not informed of the potential litigation until the suits were filed.  All told, Bank of America was forced to set aside $8.7 billion to meet the terms of the settlement agreement.  The Company also announced disappointing earnings and cut its dividend as part of an effort to raise more capital.  These announcements could not have come at a worse time

36

as Bank of America was preparing to close on a stock offering in an effort to raise

approximately $10 billion to shore up its capital levels.

**B. The Stock Offering**

98.    On October 7, 2008, Bank of America issued a press release

announcing the pricing of its common stock.  The press release stated in part:

> Bank of America Corporation today announced the pricing of its
> offering of $10 billion, or 455 million shares, of common stock.  The
> transaction includes an option to the underwriters to purchase up to
> 68.25 million additional shares of common stock.  Bank of America
> expects to deliver the shares of common stock on October 10,
> 2008.

> Banc of America Securities LLC and Merrill Lynch & Co. are
> serving as joint book runners.  The offering is being made under
> Bank of America's existing shelf registration statement filed with the
> Securities and Exchange Commission (Reg. No. 333-133852).

99.    On or about October 9, 2008, the Company filed its Prospectus for

the Offering, which forms part of the Registration Statement and became

effective on October 7, 2008.  At least 455 million shares of Bank of America

common stock were sold to the public at $22.00 per share in the secondary

offering, raising over $10 billion.

100.    The Prospectus incorporated by reference Bank of America's Form

10-K for the year ending December 31, 2007 and its Form 10-Q for the three

months and six months ending June 30, 2008.   The Prospectus further

incorporated by reference certain of the Company's Form 8-Ks filed with the

SEC, including the Company's 8-K filed on September 15, 2008, which contained

Bank of America's September 15, 2008 press release, the Company's 8-K filed

on October 3, 2008, and the Company's 8-K filed on October 6, 2008, which

contained Bank of America's October 6, 2008 press release and additional risk factors facing the Company.

101.   The Prospectus omitted important information about Bank of America's exposure to the credit markets and how the changes in the market were affecting Bank of America by the time of the Offering, including omitting information about how this exposure could affect the Company's capital base. The Prospectus further misstated the effect the Merrill Lynch Acquisition would have on the Company's capital position and overall operations.

102.   The   Registration   Statement/Prospectus   contained   untrue statements of material fact or omitted to state other material facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.

103.   The statements above were false and/or misleading because the dislocation in the financial markets was then having an increasingly severe impact on both Bank of America's and Merrill Lynch's business, which significantly increased the risk of investing in Bank of America stock.

**C. The Acquisition of Merrill Lynch**

104.   October 10, 2008 was the record date for determining the holders of the Company's common stock entitled to vote on the Acquisition.

105.   On October 30, 2008, Bank of America filed a Form 8-K with the SEC which stated in part:

> On October 26, 2008, Bank of America Corporation (the "Registrant") entered into a Letter Agreement (the "Purchase Agreement") with the United States Department of the Treasury ("Treasury"), pursuant to which the Registrant agreed to issue and

38

sell (i) 600,000 shares of the Registrant's Fixed Rate Cumulative Perpetual Preferred Stock, Series N (the "Series N Preferred Stock") and (ii) a warrant (the "Warrant") to purchase 73,075,674 shares of the Registrant's common stock, par value $0.01 per share (the "Common Stock"), for an aggregate purchase price of $15,000,000,000 in cash.

\* \* \*

Simultaneously with the Registrant's entry into the Purchase Agreement, Merrill Lynch & Co., Inc. ("Merrill Lynch") entered into an agreement with Treasury (the "Merrill Agreement") which would have allowed Merrill Lynch to sell preferred stock and warrants to Treasury for a purchase price of $10,000,000,000 prior to January 31, 2009, under certain circumstances. Treasury agreed with the Registrant that if the closing of the transactions contemplated by the Agreement and Plan of Merger dated as of September 15, 2008 by and between Merrill Lynch and the Registrant occurred prior to the closing of the issuance and sale of Merrill Lynch preferred stock and warrants to Treasury as contemplated by the Merrill Agreement, then the Merrill Agreement would be terminated and Treasury would purchase and the Registrant would issue (i) 400,000 additional shares of the Registrant's preferred stock with substantially identical terms as the Series N Preferred Stock and (ii) warrants to purchase 48,717,116 additional shares of Common Stock with an exercise price of $30.79 and substantially identical terms to the prior warrants, for an aggregate purchase price of $10,000,000,000.

106.   On November 3, 2008, Bank of America filed its Merger Proxy

Statement, dated October 31, 2008, with the SEC.  The Merger Proxy Statement

contained the following statements:

**Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors**
The Bank of America board of directors consulted with Bank of America management as well as financial and legal advisors and determined that the merger is in the best interests of Bank of America and Bank of America stockholders. In reaching its conclusion to approve the merger agreement, the Bank of America board considered a number of factors, including the following material factors:

39

- its understanding of Bank of America's business, operations, financial condition, earnings and prospects and of Merrill Lynch's business, operations, financial condition, earnings and prospects;
- its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market conditions, the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;
- the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U.S. federal income tax purposes;
- the fact that the complementary nature of the respective customer bases, business products and skills of Bank of America and Merrill Lynch is expected to result in substantial opportunities to distribute products and services to a broader customer base and across businesses and to enhance the capabilities of both companies;
- the potential expense saving opportunities, as a result of overlapping business and infrastructure, corporate staff functions, occupancy and other cost savings from miscellaneous items, currently estimated by Bank of America's management to be approximately $7 billion per year on a pre-tax basis when fully realized, as well as potential incremental revenue opportunities;
- the challenges of successfully integrating Merrill Lynch's businesses, operations and workforce with those of Bank of America and the costs of combining the two companies and achieving the anticipated cost savings, including an anticipated restructuring charge of $3 billion on a pre-tax basis and assumed amortization expense of $450 million per-annum on a pre-tax basis;
- the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made

40

by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

- the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

- the likelihood that the regulatory and stockholder approvals needed to complete the transaction will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;

- the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK; the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of

- the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America;

- the potential impact of the transaction on the capital levels and credit rating of Bank of America; and the need and ability to retain key Merrill Lynch personnel.

The Bank of America board of directors considered all of these factors as a whole and, on balance, concluded that they supported a favorable determination to enter into the merger agreement.

The foregoing discussion of the information and factors considered by the Bank of America board of directors is not exhaustive, but includes all material factors considered by the Bank of America board of directors. In view of the wide variety of factors considered by the Bank of America board of directors in connection with its evaluation of the merger and the complexity of these matters, the Bank of America board of directors did not consider it practical to, nor did it attempt to, quantify, rank or otherwise assign relative weights to the specific factors that it considered in reaching its decision. The Bank of America board of directors evaluated the

factors described above and reached a consensus that the merger was advisable and in the best interests of Bank of America and its stockholders. In considering the factors described above, individual members of the Bank of America board of directors may have given different weights to different factors.

The Bank of America board of directors determined that the transaction was in the best interests of Bank of America and its stockholders, and the board voted unanimously to approve the merger agreement and recommends that Bank of America stockholders vote "FOR" the issuance of Bank of America common stock in the merger.

107.  The Merger Proxy Statement incorporated by reference Bank of America's Form 10-K for the year ending December 31, 2007 and its Forms 10-Q for the quarters ending March 30, 2008 and June 30, 2008, and Merrill Lynch's Form 10-K for the year ending December 28, 2007 and its Forms 10-Q for the quarters ending March 28, 2008 and June 27, 2008. Additionally, the Merger Proxy Statement incorporated by reference certain of the Company's Forms 8-K filed with the SEC, including the Company's Forms 8-K filed on July 21, 2008, July 23, 2008, July 25, 2008, September 15, 2008 (2 filings), October 2, 2008, October 3, 2008, October 6, 2008, October 7, 2008, and October 26, 2008.

108.  On November 6, 2008, Bank of America filed its Form 10-Q for the third quarter of 2008, which included the same financial results previously reported on October 6, 2008.

109.  On November 19, 2008, Plaintiff purchased on the open market 20,000 Bank of America shares at $14.50 per share.

110.  On November 26, 2008, Bank of America filed a Form 425 with the SEC, which contained a letter by Defendant Lewis, which stated:

To my teammates:

42

I usually don't comment on our stock price – it is investors' job to price our stock based on their appraisal of our performance and our prospects, and my job to lead the company. But in this environment, I think it is important to share my perspective with associates regarding our stock's volatility, and how Bank of America is positioned to ride out this severe economic storm.

Investors have deep concerns about how long and deep the recession will be, how high unemployment will go, when housing prices will stabilize and what will be the catalyst to bring us out of the recession. On banks in particular, they are concerned, among other things, about whether financial institutions have enough capital. These factors are putting tremendous pressure on the markets in general, and financial stocks in particular.

Given this environment, Bank of America continues to be a strong, active player in the financial markets. We are generating strong deposit growth and attracting new customer and client relationships throughout our company. We continue to make loans to consumers and businesses to boost shareholder value and to do what we can to support economic activity.

*We are one of the most liquid banks in the world. We successfully raised capital in October and now have Tier I capital that exceeds both regulatory requirements and our own target. In short, we believe we are one of the strongest and most stable major banks in the world.*

I have gotten questions from associates and investors in recent weeks on two specific topics: the government capital injections into banks, and our decision to increase our investment in China Construction Bank (CCB).

*Regarding the federal capital injection, these were funds that we did not need and did not seek.* At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, had more than adequate capital. We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.

In the meantime, we are managing the company, and making decisions about strategic investments and other matters in the best interests of shareholders and the company, just as we would have given the economic environment and our competitive position.

43

Our decision to invest in China Construction Bank is a good example. We have known since we made our initial investment in CCB several years ago that we would have an opportunity to increase our stake at attractive terms. We made the decision based on our judgment about the prospective return for shareholders, as we always do.

While we cannot directly control or predict our stock price, there are some things we all can do to help push our business, the broader economy and, in an indirect sense, our stock price, in the right direction.

We can continue to work hard to serve customers, attract new relationships and expand existing ones. We can keep our focus on providing the highest quality service and flawless execution, giving customers and clients every reason to choose Bank of America in today's tough environment, and in better days to come. We can be the people who help customers think beyond the anxiety in today's markets, and see the opportunities we all have to build financial strength for the future.

If we do these things, I am confident that after this storm passes, investors will see the value in our franchise, the power of our brand, and especially, our associates' ability to create broad, deep and long-lasting financial relationships. Thank you again for all you are doing every day for our customers and our company.

(Emphasis added).

111.   On November 26, 2008, Bank of America announced it had received Federal Reserve approval for the Acquisition.

112.   On December 5, 2008, Bank of America issued a press release announcing that Bank of America shareholders had approved the Acquisition.

113.   On or about December 8, 2008, Merrill Lynch held its last board meeting in which its mounting losses and worsening financial condition were discussed.  According to a January 20, 2009 *The Wall Street Journal* article, attendees at the meeting were told about Merrill Lynch's continued losses, principally arising from legacy positions rather than new trades.  In connection

with these growing losses, Defendant Thain described November as "one of the worst months on Wall Street in history."   Merrill Lynch had been experiencing material client withdrawals during the fourth quarter, amounting to approximately $10 billion in withdrawals by the end of the quarter -- which represented a more than threefold increase in withdrawals over the third quarter.   This material information was not disclosed to the investing public.

114.   Shortly thereafter, Defendant Lewis turned his attention to seeking federal assistance to deal with the significant (though never disclosed to shareholders) losses at Merrill Lynch.

115.   *Seeking Alpha* reported on January 27, 2009, that on or about December 17, 2008, Defendant Lewis telephoned and later met in person with Ben Bernanke ("Bernanke"), the Chairman of the Federal Reserve Board, and Henry Paulson ("Paulson"), the Secretary of the Treasury, to inform them that, given the amount of losses and write downs Merrill Lynch was experiencing, Bank of America lacked the capital to close the Acquisition without some form of government assistance.

116.   According to *The Wall Street Journal*, Bernanke and Paulson "forcefully" urged Defendant Lewis not to raise the material adverse change provision of the Acquisition Agreement.   Rather, they offered to provide a cash infusion through the purchase of additional shares of Bank of America preferred stock and a guarantee against the losses which Bank of America would suffer from closing the Acquisition.   Bernanke and Paulson went on to intimate that if

45

Bank of America walked away from the deal, they would take that into account when dispensing government funds in the future.

117.   This proposed purchase of additional shares by the federal government would necessarily have a dilutive effect on existing shareholders and cause them harm thereby.  Bruce Vanderveen of *Seeking Alpha* discussed the impact of dilution on Bank of America noting, "With government funding, dilution can wipe out the common stock holders."  He went on to state that, ***"[T]oday's [Bank of America] common shares may not be worth much, if anything."*** (Emphasis added).

118.   On January 1, 2009, Bank of America announced that the Acquisition had been completed.

119.   The true facts, which were known by the Defendants but concealed from the investing public during the Relevant Period were as follows:

    a. The Company was failing to sufficiently reserve for mortgage-related exposure, causing its balance sheet and financial results to be overstated;

    b. The Company failed to engage in proper due diligence in assessing the fairness of the deal with Merrill Lynch;

    c. The Company's acquisitions of Merrill Lynch would have catastrophic consequences on the Company's capital position and overall operations;

    d. Merrill Lynch had not substantially decreased its risk exposure to troubled mortgage-related assets;

    e. The significant and continuing deterioration of Merrill Lynch's financial position, including its substantial fourth quarter 2008 loss, and the fact that it was sufficient to trigger termination of the merger;

f.  That the Company either knew it did not have a firm grasp on the aggregate amount of Merrill Lynch's losses and deteriorating positions or knew such information and withheld it from the public;

g.  The Company's capital base was not adequate to withstand the significant deterioration in the subprime market and, as a result, Bank of America would be forced to seek government funding in order to raise significant amounts of additional capital.

120.   As a result of Defendants' false and/or misleading statements, Bank of America's stock traded at artificially inflated levels during the Relevant Period.

**F. Loss Causation**

121.   By misrepresenting Bank of America's, Countrywide's and Merrill Lynch's financial positions, the Defendants presented a misleading picture of the Company's businesses and prospects, including Bank of America's business and prospects if it were able to consummate the Acquisitions.   Instead of truthfully disclosing that Bank of America's, Countrywide's and Merrill Lynch's businesses were not as healthy as represented, Bank of America concealed the extent of its exposure to risky real estate investments and further concealed the extent of the problems with Countrywide and Merrill Lynch.

122.   Defendants' false and misleading statements caused and maintained the artificial inflation of Bank of America's stock price throughout the Relevant Period until the truth about its financial condition and business prospects were revealed to the market.

123.   Defendants' false and misleading statements had the intended effect and caused Bank of America's stock to trade at artificially inflated levels

47

throughout the Relevant Period, reaching as high as $38.13 per share in October 2008.

124.   As set forth above, corrective disclosures taking place between January 11, 2008 and February 20, 2009 revealed previously undisclosed material information concerning, *inter alia*, the true extent of Countrywide's toxic assets, the billions of dollars in exposure Countrywide carried due to predatory lending practices, Merrill Lynch's deteriorated financial state, and Bank of America's need for federal financial assistance in order to survive the Acquisition and successfully absorb Merrill Lynch.  These corrective disclosures shocked investors and pushed down the price of Bank of America common stock in active trading from its closing price of $39.30 per share on January 11, 2008 to close at $3.79 per share on February 20, 2009, a decline of 90%.

## VII. CLAIMS UNDER SECTION 10(b) AND RULE 10b-5: CLAIMS FOR RELIEF

125.   The claims set forth herein pursuant to Section 10(b) and Rule 10b-5 sound in fraud and are based on knowing or reckless misconduct by the Defendants.  These claims are independent of any other claims asserted herein and the allegations of fraud pertaining to the claims under Section 10(b) and Rule 10b-5 do not apply in any way to the other claims for relief asserted herein.

### Second Claim for Relief for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission

126.   Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

127.   This claim for relief is brought against Defendants Bank of America, Lewis and Price (collectively, the "Fraud Defendants").

48

128.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Plaintiff against the Fraud Defendants.

129.   Throughout the Relevant Period, the Fraud Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and facilities of national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and engaged in acts, practices, and a course of business which operated a fraud and deceit upon shareholders, in violation of Section 10(b) or the Exchange Act and Rule 10b-5 promulgated thereunder.

130.   The Fraud Defendants' false and misleading statements and omissions were made with scienter and were intended to, and did, as alleged herein, (i) deceive the investing public, including Plaintiff; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and other shareholders to purchase Bank of America securities at inflated prices.

131.   The Fraud Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents and/or other public statements containing untrue statements of material fact and/or omitting facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

132.   As described herein, the Fraud Defendants made the false statements and omissions knowingly, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other shareholders who purchased Bank of America securities during the Relevant Period.  Throughout the Relevant Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.

133.   Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities by Plaintiff.

134.   In ignorance of the false and misleading nature of the Defendants' statements and/or in reliance upon the integrity of the market price for Bank of America securities, Plaintiff and other shareholders purchased the Company's securities at artificially inflated prices during the Relevant Period.  But for the fraud, Plaintiff would not have purchased the Company's securities at artificially inflated prices.

135.   The market price for Bank of America securities declined materially upon the public disclosures of the facts that had previously been misrepresented or omitted by the Defendants as described above.

136.   Plaintiffs and the other shareholders were substantially damaged as a direct and proximate result of their purchases of Bank of America securities at artificially inflated prices and the subsequent decline in the price of those securities when the true state of affairs was revealed.

50

137.   This claim was brought within two years of the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

138.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff who has been damaged as a result of such violation.

**A. Fraud on the Market**

139.   The market for Bank of America's common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose, as set forth above, Bank of America's common stock traded at artificially inflated prices during the Relevant Period.  Plaintiff purchased or otherwise acquired Bank of America's common stock relying upon the integrity of the market price of Bank of America's common stock and market information relating to Bank of America, and has been damaged thereby.

140.   During the Relevant Period, Defendants materially misled the investing public, thereby inflating the price of Bank of America common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.   These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Bank of America, its business and operations.

51

141.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff.

142.   As described above, during the Relevant Period, Defendants made or caused to be made a series of materially false or misleading statements about Bank of America's business, and financial condition.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Bank of America and its business and operations, thus causing its common stock to be overvalued and artificially inflated at all relevant times.

143.   Defendants' materially false and misleading statements during the Relevant Period resulted in Plaintiff purchasing Bank of America's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Third Claim for Relief for Violation of Section 20(a) of the Exchange Act**

144.   Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

145.   This claim for relief is brought against the Individual Defendants.

146.   As alleged herein, the Individual Defendants are liable to Plaintiff who purchased Bank of America's securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

147.   Throughout the Relevant Period, the Individual Defendants were controlling persons of Bank of America within the meaning of Section 20(a) of the

Exchange Act, and culpable participants in Bank of America's fraud and violation of the federal securities laws, as detailed herein.

148.   The Individual Defendants exercised control over Bank of America during the Relevant Period by virtue of, among other things, their positions with the Company, the key roles they played within the Company, and their involvement in its public disclosures.

149.   This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

150.   By virtue of the forgoing, the Individual Defendants are liable to Plaintiff, who has been damaged as a result of Bank of America's underlying violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

a.      Awarding Plaintiff compensatory damages;

b.      Awarding Plaintiff pre-judgment and post judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

c.      Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all claims on which a jury trial is available

Dated: Friday, February 27, 2009

53

Respectfully submitted,

/s/ Rex A. Sharp
Rex Sharp KS#12350
Gunderson Sharp & Walke, LLP
5301 W. 75th Street
Prairie Village, KS 66208
913-901-0500
913-901-0419 fax
rsharp@midwest-law.com

David Sharp KS# 10624
Gunderson Sharp & Walke, LLP
700 Louisiana St., Ste. 2300
Houston, TX 77002
(713) 221-2337
(713) 583-5448 fax
dsharp@midwest-law.com

William B. Federman
Federman & Sherwood
10205 N. Pennsylvania
Oklahoma City, OK 73120
(405) 235-1560
(405) 239-2112
wbf@federmanlaw.com

Attorneys for Plaintiff